# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

KARLA LAVERNE SEALS,

        Plaintiff,

v.                                                           ACTION NO. 2:18cv22

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Karla Laverne Seals ("Seals") brought this action, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 12. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Seals' motion for summary judgment (ECF No. 16) be **DENIED** and that the Commissioner's motion for summary judgment (ECF No. 17) be **GRANTED**.

## I.     PROCEDURAL BACKGROUND

Plaintiff, Karla Laverne Seals, filed applications for disability insurance benefits on August 12 and September 6, 2013, respectively, alleging that she became disabled on December 2, 2011,

due to acquired immunodeficiency syndrome ("AIDS"), hepatitis C, herpes, depression, and anxiety.[1] R. 98–99, 104, 135, 209–10. Following the state agency's denial of these claims, both initially and upon reconsideration, Seals requested a hearing before an Administrative Law Judge ("ALJ"). R. 98–134, 138–42, 157–59.

ALJ Maryann S. Bright heard the matter on October 11, 2016, and issued a decision denying benefits on January 10, 2017. R. 19–31, 37–78. On November 17, 2017, the Appeals Council denied Seals' request for review of the ALJ's decision. R. 1–5. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted all administrative remedies, Seals filed a complaint with this Court on January 29, 2018. ECF No. 3. The Commissioner answered on April 30, 2018. ECF No. 10. In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on June 11 and July 11, 2018, respectively. ECF Nos. 16, 16-1, 17–18. Seals replied to the Commissioner's summary judgment motion on July 25, 2018. ECF No. 19. As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II.  RELEVANT FACTUAL BACKGROUND

### A.  *Background Information and October 11, 2016 Hearing Testimony by Karla Seals*

Born in 1968, Seals completed her high school education, and was 44 years old as of the amended onset date of disability of August 14, 2013.[2] R. 40, 43, 209, 253. Seals and her spouse

---

[1] Page citations are to the administrative record that the Commissioner previously filed with the Court.

[2] At the hearing before the ALJ, Seals amended the onset date from December 2, 2011 to August 14, 2013. R. 40.

divorced in April 2015.  R. 416.  Afterwards, Seals took up residence with her then 21-year old son and his girlfriend.[3]  R. 43.

Before the alleged onset of her disability, Seals worked as a massage therapist and, before that, as a water meter reader.  R. 47–48, 253 (noting work as masseuse from March 2007 through October 2013).  After finding that she could no longer deal with people and "didn't want to touch . . . , be around . . . , or talk to them," Seals stopped working and let her massage therapist license expire.  R. 47–48, 59.  Seals elaborated that she could not "be around people for any length of time without freaking out" due to anxiety and fear, R. 50, and found herself "canceling more appointments than [she] was keeping."  R. 58–59.  Seals reported coping by staying home four to five days a week or, "if [she] was at the shop, [she] would sit in there with the door locked and closed sign just kind of hiding out from the world."  R. 59.  Previously, while working as a meter reader, and well before any diagnosis, Seals stated she coped by hiding in a bathroom and waiting for the anxiety to pass.  R. 50.

Seals told the ALJ she suffered from anxiety, bi-polar depression, obsessive-compulsive disorder ("OCD"), human immunodeficiency virus ("HIV"), migraine headaches, fluctuating weight, symptoms related to these conditions, and the side effects of medications.  R. 44, 50–53, 56–57, 60–62, 64–70.  At the time of the hearing, Seals was taking:  (1) Norvir, Truvada, and Reyataz for HIV; (2) acyclovir for herpes; (3) fluconazole for thrush/yeast infection; (3) trazadone for depression and sedating; (4) risperidone for bipolar disorder and psychosis; (5) Xanax for anxiety; and (6) Effexor for depression.  R. 70, 304.

---

[3] Unless otherwise noted, the facts recited in this subsection recount Seals' testimony about her life and conditions as of the hearing date of October 11, 2016.  R. 37.

With respect to mental health, Seals said she has anxiety spells "sometimes . . . a few times a week" and "[s]ometimes [she] can go a whole week." R. 51. During such episodes and on low energy days, Seals described herself as "afraid to leave" the safety of home and unable to concentrate, focus, or intelligibly converse, with her "brain . . . racing in ten different directions." R. 61; *see* R. 59–60. Although she reported seeing a psychiatrist once a month and a therapist on a weekly or biweekly basis, Seals had no recent hospitalizations or emergency room visits and denied receipt of any in-patient treatment for anxiety. R. 51–52.

With respect to bi-polar depression, Seals described mood swings that left her, at times, feeling "on top of the world" and able to "pack as much housework and cleaning in" as possible, only to be followed a "crash" and "tears for absolutely no reason" later the same day. R. 51. Sometimes when she "crash[ed]," Seals reported that she cried and slept for long periods of times, including for over 24 hours. R. 68–69. To treat these swings, Seals reported taking an "antipsychotic . . . and it helps somewhat," but she still has some "roller coaster" days. R. 51.

Seals also reported suffering from OCD and noted that, during panic attacks, she counts all manner of things to calm and soothe herself. R. 65–68 (also noting methodical behaviors in folding laundry and handwashing).

With respect to AIDS, Seals testified that she has access to insurance that pays for medications and counseling.[4] R. 44, 65 (noting she sees her "HIV doctor" once every six months). Seals testified that her HIV medications cause diarrhea, nausea, and vomiting "a couple times a week" and these symptoms, which require proximity to a bathroom, impact her ability to work. R. 52, 56–58.

---

[4] Such services were provided via the Ryan White Foundation. R. 391.

Seals also reported having stress-induced migraines which, during periods of heavy stress, occur on a weekly basis and last from three hours to a full day.  R. 64–65 (noting also that regular work "would probably make them worse").  Seals identified stressful activities as including dealing with people, going to doctors' appointments, and driving in unfamiliar places.  R. 65.

Finally, Seals testified to weighing approximately 280 pounds and attributed her fluctuating weight (ranging from 250 to 280 pounds) to bouts of binging and periods of not wanting to get out of bed.  R. 62 (noting the latter occur "a couple of times a month").

Seals testified that her combined physical and mental ailments prevent her from attending to and working regularly.  R. 47, 50.  She also stated that:  (1) her anxiety attacks were unpredictable and "getting worse," although taking medication provided some relief, R. 47, 50; (2) she was embarrassed to be around others, and sometimes cries and shakes, R. 50, 56; (3) her ability to focus and concentrate varied from day to day, and she cannot concentrate for very long, R. 60, 69; (4) some days she was unable to perform simple tasks, such as placing a call or answering one from her attorney, R. 61; and (5) when obsessively counting to calm herself, her ability to focus on work tasks would necessarily suffer, R. 68.

To try to move forward with life, Seals testified that she began taking college classes two years before the ALJ hearing.  R. 46–47.  Originally, Seals took a class on campus, with her son, because she was afraid to do so by herself.  R. 55–56.  Upon finding herself unable to be around groups of people and having to go to the bathroom to cry, Seals decided that this was too taxing and switched to online classes.  R. 45–46, 55–56.  In the semester prior to the ALJ hearing, Seals took one class.  R. 45.  At the time of the hearing, Seals was taking two classes.  R. 45 (noting she was "failing English and . . . doing okay in abnormal psychology").

Seals admitted engaging in various activities during a typical day and week. These included: (1) doing school work two to four hours per week, R. 54; (2) reading (both for school and pleasure), R. 53–54; (3) playing word games to calm her brain, R. 53; (4) occasional cooking and cleaning, R. 51, 54; (5) grocery shopping (sometimes alone, but preferably with her son due to his "calming" presence), R. 54, 58; (5) spending roughly one hour per day on the computer, including social media, R. 54; (6) caring for two cats, R. 54–55; (7) going on half-mile neighborhood walks with her son, R. 55; (8) interacting with a neighbor a few times per week, R. 63–64; and (9) driving a car approximately three times per week, R. 44.

In an adult function report dated February 13, 2014 and completed before her divorce, Seals noted activities and limitations like those described above. R. 267–74. She also noted that, upon waking, she ate breakfast with her spouse and watched the news. R. 267. She reported trying to go for daily walks. *Id.* She advised that she cared for her husband, who suffered a stroke, by keeping his medication box full and taking him to doctors' appointments. R. 268, 371. Seals advised she slept too long during bouts of depression and too little (roughly three hours) during attacks of anxiety. R. 268. Seals reported having no problems with personal care tasks. *Id.* With respect to cooking, Seals advised that she no longer did all the cooking for her spouse and son, who now helped out. R. 269 (noting she prepared simple, quick meals). Seals also reported that poor stamina affected her ability to do and to sustain certain tasks and activities. R. 269–72. Although Seals indicated that she paid the bills, used financial accounts, and regularly went to the grocery store, pharmacy, and medical appointments, she also stated that she kept a notebook to address forgetfulness regarding such tasks and maintaining concentration. R. 270–72. Seals further reported that her ability to follow instructions depended "on how fuzzy [her] brain" was on any given day, how long she slept, and on what medications she was taking. R. 272. Finally, Seals

6

noted that she received counseling to deal with the constant fear of death attendant to having AIDS. R. 273.

**B.**  *Relevant Medical Evidence[5]*

    **1.**  *Treatment at Community Psychological Resources*

Seals received treatment at Community Psychological Resources ("CPR") from the alleged date of onset, August 14, 2013, through August 15, 2016.[6]  R. 370–75, 466.  She was referred for such treatment by Alycia Dickens, D.N.P., her primary care provider.  R. 370.  Seals underwent counseling with CPR therapist Julie T. Newsome, L.P.C., on nine occasions, and with another CPR therapist on four occasions, during those three years.  R. 370, 379–80, 396–400, 441, 443–45, 453. Seals also received medication management treatment at CPR from psychiatrist Huma Hyder, M.D., on three occasions in the summer of 2016.  R. 438–39, 466.

During her initial therapy session on August 14, 2013, Seals presented with complaints of forgetfulness, trouble concentrating, anhedonia, symptoms of depression and anxiety (including crying, low self-esteem, lack of energy, a recent inability to work, impaired sleep, and racing thoughts), menstrual problems, and estrangement from her spouse.[7]  R. 370, 372–73.  Seals reported a history of depression, anxiety, and OCD.  R. 372.  A mental status examination revealed Seals to be: (1) alert, cooperative, speaking fast, and extremely tearful; (2) exhibiting appropriate eye contact, appropriate dress, logical thought processes, and no dangerous thought content;

---

[5] Because Seals' motion for summary judgment does not challenge the ALJ's findings concerning her physical impairments, the Court focuses upon her mental health treatment record.

[6] Previously, Seals received treatment at CPR on one occasion on October 25, 2010.  R. 365.

[7] Seals reported crying on a daily basis, having feelings of anger, agitation, and sadness, and said she needed a break from caring for her disabled husband.  R. 376.  She also reported recently meeting other men.  *Id.*

(3) presenting with hyperactive motor behavior, an affect matching her depressed mood, impaired attention, inadequate concentration, adequate memory, fair insight, and fair to poor judgment; and (4) without suicidal or homicidal ideation. R. 374. After assessing that Seals had problems with her husband, her social environment, and economic situation, therapist Newsome identified a treatment plan comprised of cognitive therapy and counseling every two to three weeks focusing upon Seals' depression, anxiety, and marital difficulties, prescribing medications for depression and anxiety, and attempting to improve her sleep. R. 375.

Seals returned to CPR on August 30, 2013 and reported to the therapist that the Wellbutrin was "working extremely well" (after just 10 days) but requested medication for anxiety. R. 379 (noting therapist called primary care provider and discussed prescribing Buspar). Although expressing some sadness upon her son's departure for college, Seals advised that her spousal relationship was "less tense" and that she had recently addressed stacks of bills she had been previously ignoring. *Id.*

During therapy on September 16, 2013, Seals reported that her newly prescribed anxiety medication, Buspar, was ineffective, but that Wellbutrin was effective and she was "no longer tearful." R. 380 (discussing impediments to use of anxiety medications). Seals also advised she did not plan to stop meeting another man. *Id.* When asked to see a CPR psychiatrist for medication management, Seals declined saying it was too difficult to care for her husband and travel an hour for such an appointment. *Id.* On October 16, 2013, Seals canceled her appointment for that date, stating that CPR's office was too far away "for now." R. 381.

Nearly four months later, on February 5, 2014, Seals received emergency counseling from the therapist to discuss her spouse's "erratic behavior" and her depression and anxiety, with concomitant poor self-esteem and emotional control. R. 453. Seals reported wanting a divorce,

but also expressed concern about her own lack of income and her husband's inability to cook and care for himself, pay the bills, manage his medications, and get to doctor's appointments. *Id.* Noting Seals' difficulty in traveling to future appointments, the therapist provided her with workbooks to review at home.[8] *Id.*

On April 3, 2014, therapist Newsome and Nicole Searfoss, Psy.D., of CPR prepared a mental status evaluation of Seals and submitted it to disability determination services in conjunction with Seals' claim for benefits. R. 365–69. They diagnosed Seals as having a major depressive disorder, recurrent and moderate, and a generalized anxiety disorder with panic attacks. R. 365. Notwithstanding the February 5, 2014 visit noted above, the evaluators indicated that Seals "hasn't returned [to CPR] since 9/16/2013 due to being [one hour] from office [and] does not wish to leave house [and] drive that far." R. 369.

Aside from the diagnoses, this evaluation mostly repeated the observations noted above. R. 365–69. It also noted that Seals experienced anxiety and panic attacks when working, driving, or interacting with others and took to isolating herself in her rural home, rather than confronting difficulties with encountering others and attending therapy appointments. R. 365–66. It reported that Seals had problems coping with traffic, others, her and spouse's health problems, her son's absence, daily mail, and bill paying. R. 368. Further, although discussing Seals' ability to do light housekeeping, cook, and drive to stores and appointments, the evaluation noted that depression sapped her desire for such tasks and left her feeling overwhelmed. R. 366. It described Seals as "extremely tearful" and suffering from "extreme guilt" for tasks not completed and from an impaired attention span and inadequate concentration. R. 365, 368. It noted that, while Seals

---

[8] On March 11, 2014, Seals told her primary care provider that she stopped going to therapy due, in part, to transportation issues. R. 382.

exhibited fair to poor judgment in dealing with relationship problems and the daily mail and bills, she was well-oriented, exhibited logical thinking, had an adequate memory, and was able to do simple math and abstract reasoning, as well as household budgeting. R. 367–69.

On June 5, 2014, Seals again met with her therapist at CPR and discussed her relief at her son's return from college and her efforts to "voice positive self[-]statements." R. 400–03. She also described feeling drained by her spouse's increasingly erratic and angry behavior, his recent health issues due to a motorcycle accident, and medication abuse issues. *Id.* (noting Seals wanted "out of the marriage[, but her] husband refuse[d]"). R. 400. The therapist recommended that Seals return every two to three weeks, adhere to her medication regimen, work on improving sleep, use cognitive behavioral techniques and materials, and referred her to CPR's psychiatrist, Dr. Huma Hyder.[9] R. 400, 403.

From June 23 through August 24, 2014, Seals saw her therapist at CPR four more times. R. 396–99. In these sessions, they discussed, among other things, Seals' continuing marital discord, her spouse's verbally abusive behavior, including his threat to evict Seals, the extensive care she provided to him, a backup plan to move in with another family member, her acceptance of her AIDS diagnosis, and her son's return to college. *Id.* During these sessions, Seals reported some progress using the self-help materials and exhibited increasing self-confidence. R. 396–98. Although the therapist reported that Seals was typically tearful and displayed symptoms of anxiety, on August 24, 2014, the therapist observed that Seals was "less tearful and trying to stay away from home to [reduce] anxiety [symptoms]." R. 396–97.

---

[9] A later treatment note from June 23, 2014 indicated that the first available appointment dates with Dr. Hyder were in October or November 2014. R. 399.

No record exists of Seals receiving treatment at CPR from August 25, 2014 until April 28, 2016, when Seals received a new patient evaluation at CPR's Norfolk, Virginia office, with a different therapist. R. 396, 445–51. In the interim, the primary care provider treating Seals for AIDS and hepatitis saw her on October 10, 2014, when Seals reported that "she [was] going through a divorce." R. 406. The provider noted that, while Seals' active problems continued to include anxiety and depression, during a review of symptoms Seals reported "no lethargy," "depression," or "insomnia." R. 407.

During an April 28, 2015 follow-up appointment with her primary care provider, Seals reported that her divorce was just finalized and expressed a need to resume psychotherapy. R. 416. The treatment notes reflect that Seals also stated that she failed to follow through with a psychiatric appointment and regular psychotherapy, and that the divorce seemed to worsen her chronic depression. R. 416–17; *see* R. 419 (recommending restarting psychotherapy and referring for mental health). Similar reports of depression and/or anxiety and referrals for mental health treatment are contained in the primary care provider's treatment notes for September 29–30, 2015, and January 12, 2016. R. 420–31.

On April 28, 2016, Seals returned to counseling at CPR, with a different therapist. R. 445–50. She presented with complaints of panic attacks and depression and reported erratic sleeping and eating patterns. R. 445, 447. She reported continuing to take Wellbutrin, and Xanax as needed, and said when she took Lexapro her "suicidal impulses stopped immediately." R. 448. A mental status examination resulted in mostly unremarkable findings, except for a depressed mood and poor insight and judgment. R. 449. The treatment plan called for reducing symptoms of depression, improving coping skills, referral to a psychiatrist, and resumption of individual therapy. R. 450.

From May 13, 2016 through July 18, 2016, Seals had five therapy appointments scheduled with CPR and canceled two of them. R. 440–44. During appointments on May 13 and 23, and June 20, 2016, Seals presented as tearful, anxious, agitated, fatigued, and hopeless. R. 441, 443–44. Seals reported an inability to work and worried about asking Dr. Hyder to complete disability forms. R. 443. Seals reported having a positive relationship with her son and his fiancée and found pleasure in planting a small garden. R. 441.

On three occasions between June and August 2016, Seals also treated with psychiatrist Huma Hyder, M.D.[10] R. 438–39, 466. During a June 20, 2016 medication management appointment, Seals complained of increasing anxiety, depression, anger, and panic attacks. R. 439. In response, Dr. Hyder discontinued a sample medication, continued use of Wellbutrin, and prescribed Effexor, Xanax and risperidone. *Id.*

Following up on July 18, 2016, Dr. Hyder discontinued the Wellbutrin and increased the dosage of Effexor. R. 438. Seals reported, and said her son had noticed, an improvement in her anger, irritability, depression, and mood swings. *Id.* Dr. Hyder's notes also indicate Seals was reasonably tolerating her medications, except for one that affected her sleep. *Id.*

Seals returned for medication management on August 15, 2016, when Dr. Hyder prescribed trazodone, Effexor, Xanax, and Risperdal. R. 466. Dr. Hyder noted continued improvement in Seals' mood, identified as "good" and "stable," and that medication was "helping" to make her anxiety "manageable." *Id.*

On August 23, 2016, therapist Newsome completed a form assessing Seals' mental capacity for "work-related activities on a day-to-day basis in a regular work setting" by checking various boxes and making notations on the form. R. 469–71. Newsome listed Seals' diagnoses as

---

[10] Dr. Hyder's medication management notes are barely legible.

12

OCD, generalized anxiety disorder, and major depression, recurrent and severe. R. 469. Newsome opined that Seals had marked and extreme limitations in all but three of the twenty abilities assessed. R. 469–71. Newsome assessed that Seals had: (1) marked and extreme limitations in her ability to understand and remember work-like procedures and instructions;[11] (2) mostly marked to extreme limitations in sustaining concentration and persistence at work;[12] (3) mostly marked to extreme limitations in interacting socially as needed at work;[13] and (4) mostly marked to extreme limitations in the adaptation needed to work.[14]

### 2.   *Consultative Examination and State Agency Physician Reviews*

On June 16, 2014, Seals drove 15 miles for a consultative psychological evaluation with Randy Rhoad, Psy.D., a licensed clinical psychologist. R. 390–94. Throughout the exam, Seals "displayed a rather significant degree of tearfulness." R. 390. She said she filed for disability because she has AIDS and "think[s] about dying all the time," and suffered from depression and anxiety. R. 390. In describing her history, Seals advised that she functioned well until contracting HIV at age 22, and last worked on a part-time basis in June or July 2014 at a chiropractic office providing therapeutic massages to patients.[15] R. 390–91. Seals described her normal day as

---

[11] Newsome based this assessment upon Seals' response to "instructions regarding her medications [and] regimen of medication schedules" during their treatment sessions. R. 469.

[12] Newsome based this assessment upon Seals' propensity for missing and canceling appointments and failure to refill medications "due to persistent, disruptive anxiety and panic attacks as well as severe depression and hopelessness" and noted that OCD would decrease her productivity. R. 470.

[13] Newsome based this assessment upon Seals' persistent anxiety, severe depression, and overall feeling of worthlessness. R. 470.

[14] Newsome based this assessment upon her observations of Seals and their discussions about her work history. R. 471.

[15] This statement is consistent with the ALJ's reference to other evidence indicating that Seals may have worked in some capacity after the revised, alleged onset date of disability. R. 21; *see also* R.

involving "a lot" of sleeping and performing basic household chores, including meal preparation. R. 391.

Dr. Rhoad's mental status examination found Seals: (1) appropriately dressed; (2) with "relatively normal" gait and posture and appetite; (3) using appropriate speech and language and able both to understand inquiries and express herself; (4) well-oriented as to person, place, and time; (5) hesitant in responding to some "fund of knowledge" questions; (6) presenting with "relatively intact cognitive functioning skills, with intellectual functioning skills likely falling within the Low-Average range"; (7) without suicidal or homicidal ideation; (8) with "relatively intact" insight and judgment and adequate impulse control; (9) reporting sleep difficulties due to racing thoughts; and (10) as "moderately restricted and blunted" and having a "seemingly moderately depressed" mood. R. 391–92.

Based upon his evaluation, Dr. Rhoad reported that Seals "seemingly presented in a credible manner" and gave no indication of exaggerating her symptoms. R. 392–93. He diagnosed her with a major depressive disorder, recurrent and moderate, with somatic symptom disorder, moderate to severe, and with moderate, generalized anxiety disorder, and said her prognosis was uncertain. R. 393. Functionally, Dr. Rhoad opined that Seals: (1) "may be cognitively capable of performing . . . simple and repetitive work assignments"; (2) may have some difficulty in consistently performing work tasks due to symptoms stemming from her anxiety, depression, and somatic symptom disorder; (3) while capable of receiving supervisory instruction, may need "extra assistance and supervision in completing tasks" due to memory and concentration difficulties

---

253 (reporting work through October 2013), 359 (reporting continued part-time work on August 30, 2013), 382 (continuing to work part-time as of March 11, 2014), 390–91 (stating last worked part-time in summer of 2014), 406 (noting "no longer working part-time" on October 10, 2014). In the absence of earning records documenting the same, the ALJ concluded that such "work activity did not rise to the level of substantial gainful activity." R. 21.

"likely related to her symptoms of depress[ion] and anxiety"; (4) "may be capable o[f] basic interaction with others," but her ability to do so consistently may be problematic; (5) has a significantly reduced tolerance for stress; and (6) may find it difficult to complete typical workday and workweek tasks due to her current symptoms. R. 393–94.

On October 28 and again on December 24, 2014, Joseph Leizer, Ph.D., assessed Seals' mental residual functional capacity ("RFC").[16] R. 110–12, 128–30. With respect to memory and understanding, Dr. Leizer found that Seals was moderately limited in understanding and remembering detailed instructions, but not significantly limited with respect to simple instructions and workplace locations and procedures. R. 110, 128–29. With respect to sustaining concentration and persistence, Dr. Leizer found Seals not significantly limited in following simple instructions, working within a schedule, maintaining attendance, sustaining a workplace routine, and working in proximity to others. R. 110, 129. He also found, however, moderate limitations in following detailed instructions, sustaining attention and concentration for longer time periods, and completing a typical workday and week without interruption from psychological symptoms and performing at a consistent pace with typical rest periods. R. 110–11 (opining that Seals "[w]ould be able to work for at least 2 hours at a time and . . . complete simple tasks"), 129. Although noting Seals was socially isolated and moderately limited in interacting with the public, Dr. Leizer found her otherwise not significantly limited in social interaction due to Seals' demonstrated ability to go out alone, drive, go shopping, and handle money. R. 111, 129–30. He also assessed that Seals was "no more than moderate[ly] limit[ed] in adapting to" workplace changes. R. 111, 130. Subject to the foregoing limitations and considering Seals' activities of daily living noted above, Dr. Leizer

---

[16] These state agency assessments are identical. Notwithstanding that the record identifies the first as signed by Joseph Leizer, Ph.D., R. 112, and the second by Howard S. Leizer, Ph.D., R. 130, the Court adopts the approach taken by the parties and the ALJ, and treats them as one.

concluded that Seals could perform simple, routine, repetitive tasks at work.  R. 111–12, 130.

**C.    *Hearing Testimony of Vocational Expert Barbara Byers***

At the hearing before the ALJ, Barbara Byers, a vocational expert ("VE"), responded to the ALJ's hypothetical questions concerning the availability of jobs for a person of Seals' age, education, work experience, and residual functional capacity.  R. 71–76.  With respect to light, unskilled work, and subject to the limitations specified by the ALJ, VE Byers testified that work existed in the national economy for a person having such a profile in the occupations of agricultural produce sorter, marking clerk, and mail clerk.  R. 72–74.

In response to a question from claimant's counsel, VE Byers testified that there would no jobs for such a hypothetical person if:  (a) the person could not adapt to workplace changes 15% or more of the time; (b) the person could not accept instruction or respond appropriately to supervisor criticism 15% or more of the time; (c) the person could not get along with co-workers or peers, without behavior problems, 15% or more of any work day; or (d) the person could not work close to or in coordination with others without distraction 15% or more of the time.  R. 75–76.

### III.    THE ALJ's DECISION

To evaluate Seals' claim of disability,[17] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled.  *See* 20 C.F.R.

---

[17] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a); *accord* 42 U.S.C. § 423(d)(1)(A).  To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.  20 C.F.R. § 404.1505(a).

§ 404.1520(a). Specifically, the ALJ considered whether Seals: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 21–30.

The ALJ found that Seals met the insured requirements[18] of the Social Security Act through December 31, 2018, and she had not engaged in substantial gainful activity since August 14, 2013, her amended onset date of disability. R. 21.

At steps two and three, the ALJ found that Seals had the following severe impairments: (a) major depressive disorder; (b) generalized anxiety disorder with panic attacks; (c) OCD; (d) AIDS; (e) hepatitis B;[19] and (f) obesity. R. 22. The ALJ classified any additional impairments as non-severe, because they responded to medication or required no significant medical treatment, failed to continuously exist for twelve months, or did not otherwise continuously impose functional limitations. R. 22. The ALJ further determined that Seals' severe impairments, either singly or in combination (along with her other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 22–24.

The ALJ next found that Seals retained the functional capacity to perform light work. *See* 20 C.F.R. § 404.1567(b). To perform such work, the ALJ also determined that Seals: (a) could

---

[18] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

[19] Although Seals' claim for benefits referenced hepatitis C, *see, e.g.,* R. 98, 252, the record reflects that she also was "co-infected with hep[atitis] B." *See, e.g.,* R. 406.

"occasionally climb ramps and stairs" and "stoop, crouch, kneel, and crawl"; (b) could "never climb ladders, ropes, or scaffolds"; (c) must "avoid concentrated exposure to extreme [conditions] . . . and [other specified] hazards"; (d) could perform only non-complex, "simple, routine, and repetitive tasks consistent with unskilled work," involving sustaining and attending to such tasks in two-hour segments, during normal workdays and weeks, "with customary breaks"; (e) could perform only "low stress work" requiring only occasional decision-making and presenting "only occasional changes in the work setting"; and (f) should have "no interaction with the general public and superficial interaction with coworkers and supervisors." R. 24–25. Based upon this assessment of Seals' RFC, at the fourth step of analysis the ALJ found that Seals could no longer work as a massage therapist or water meter reader. R. 29.

Finally, at step five, and after considering Seals' age, high school education, work experience, and RFC, the ALJ found that she could perform other jobs, such as an agricultural produce sorter, a marking clerk, or a mail clerk, which existed in significant numbers in the national economy. R. 29–30. Accordingly, the ALJ concluded Seals was not disabled from August 14, 2013 through the date of the ALJ's decision and was ineligible for a period of disability or DIB. R. 31.

## IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## V.   ANALYSIS

***Substantial evidence supports the ALJ's decision and she committed no error in assessing Seals' mental residual functional capacity and evaluating the opinion evidence.***

Seals argues that the ALJ erred in evaluating the opinion evidence concerning her mental RFC and, therefore, the denial of benefits is unsupported by substantial evidence. Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 16-1 at 12. Seals asserts the ALJ not only erroneously relied upon the opinion of the non-examining state agency psychologist over those

rendered by Seals' treating and consulting providers, but also failed to adequately explain the grounds therefor. Pl.'s Mem. 12–13. Seals also argues that the ALJ, in assessing her daily activities and recent improvement while medicated, gave short shrift to her lengthy history of mental health struggles. *Id.*

### 1.    *The standard for evaluating opinion evidence in the context of determining a claimant's residual functional capacity*

The regulations provide that, after step three of the ALJ's five-part analysis but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. § 404.1545(a). The RFC is a claimant's maximum ability to work despite her limitations. *Id.* at § 404.1545(a)(1). The ALJ then uses that RFC to determine whether the claimant can perform her past relevant work. *Id.* at § 404.1545(a)(5). The determination of RFC is based upon a consideration of all the relevant medical and other evidence in the record. *Id.* at § 404.1545(a)(3).[20]

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions[21] of treating providers. *Felton-Miller v. Astrue*, 459

---

[20] "Other evidence" includes statements or reports from the claimant, the claimant's treating or non-treating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

[21] "Medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions." 20 C.F.R. § 404.1527(a)(1). An "acceptable medical source" includes a licensed physician or psychologist, but not a licensed counselor. 20 C.F.R. § 404.1502(a). Evidence from medical sources other than an acceptable medical source, such as a licensed therapist, will be considered to show the severity of the individual's impairments and how they affect the ability to function. Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *2 (S.S.A.); 20 C.F.R. § 404.1502(d) (defining a "medical source" to include one who is state licensed and engaged in a scope of practice authorized by federal or state law).

F. App'x 226, 231 (4th Cir. 2011).  For claims like Seals', filed before March 27, 2017,[22] a treating

provider's opinion merits "controlling weight," under federal regulations and Fourth Circuit

authority, if it is "well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R.

§ 404.1527(c)(2); *see also Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017).  Conversely, if a

treating provider's "opinion is not supported by clinical evidence or if it is inconsistent with other

substantial evidence, it should be accorded significantly less weight."[23] *Craig*, 76 F.3d at 590.

However,

> a finding that a treating source medical opinion is not well-supported by medically
> acceptable clinical and laboratory diagnostic techniques or is inconsistent with the
> other substantial evidence in the case record means only that the opinion is not
> entitled to "controlling weight," not that the opinion should be rejected.

SSR 96-2p, 61 Fed. Reg. 34490, 34491, 1996 WL 374188, at *4 (S.S.A.).

When an ALJ assigns other than controlling weight to a treating provider's opinion, it is

"still entitled to deference and must be weighed using all of the factors" provided by the

regulations.  *Id.*  The main factors are:  (1) the examining relationship, giving more weight to

sources who have examined a claimant; (2) the treatment relationship, looking at the length, nature,

and extent of the treatment relationship; (3) supportability, based upon the extent of the evidence

---

[22] On January 18, 2017, SSA promulgated a final rule that revised its medical evidence rules, including the treating physician rule, and specified that the revisions apply to claims filed on or after March 27, 2017.  *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017).

[23] In this regard, a treating provider's opinion that a claimant suffers from a disabling impairment and cannot work touches upon a matter reserved by regulation to the Commissioner, who is responsible for making disability determinations.  20 C.F.R. § 404.1527(d).  Although the Commissioner will consider "the medical findings and other evidence" giving rise to a disability opinion, such an opinion neither controls nor is accorded "special significance" by the SSA.  20 C.F.R. § 404.1527(d)(1), (d)(3).

presented in support of the opinion; (4) consistency with the record; and (5) the specialization of

the provider. 20 C.F.R. § 404.1527(c) (also noting ALJ's obligation to "give good reasons . . . for

the weight" given to a treating source opinion); *see Brown v. Comm'r of Soc. Sec.,* 873 F.3d 251,

256 (4th Cir. 2017) (noting that the first two factors are "specific to treating sources," while the

latter three apply to evaluating medical opinions from both treating and non-treating sources).

By regulation, the ALJ must also explain the weight assigned to *all* opinions, including

treating sources, non-treating sources, state agency consultants, and other non-examining sources.

20 C.F.R. § 404.1527. Therefore, when the ALJ's decision is not fully favorable to the claimant,

the decision must contain

> specific reasons for the weight given to the treating source's medical opinion,
> supported by the evidence in the case record, and must be sufficiently specific to
> make clear to any subsequent reviewers the weight the adjudicator gave to the
> treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. This specificity requirement is necessary because a reviewing

court

> face[s] a difficult task in applying the substantial evidence test when the
> [Commissioner] has not considered all relevant evidence. Unless the
> [Commissioner] has analyzed all evidence and has sufficiently explained the weight
> he has given to obviously probative exhibits, to say that his decision is supported
> by substantial evidence approaches an abdication of the court's "duty to scrutinize
> the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Sec'y of Health, Ed. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim*

*v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

> **2.    *The ALJ's statement of reasons for weighing the opinion evidence are***
> ***supported by the record.***

The ALJ attributed "only partial weight" to the opinions of Dr. Rhoad, Dr. Searfoss, and

therapist Newsome, while attributing "more weight" to the assessments made by Dr. Leizer, the

non-examining state agency psychologist. R. 28. Although Seals argues that the ALJ's rationale

for "subordinating [the former] to someone who never evaluated [Seals] for a mental health condition lacks any reasonable explanation," Pl.'s Mem. 13, the Court disagrees.  In fact, the decision reflects that the ALJ based the RFC determination upon review of all relevant medical and other evidence in the record. *See* 20 C.F.R. § 404.1545(a)(3).  In doing so, the ALJ did not reject the opinions of the treating and consulting providers, but rather only assigned them partial weight, while assigning greater weight to Dr. Leizer's opinion. R. 28.  Further, the ALJ provided sound reasons for doing so, noting that Seals received only "conservative and intermittent mental health treatment," showed "documented improvement" when treated with prescribed medications, and engaged in extensive activities inconsistent with a disability finding. *Id.*

### a. *The nature and history of Seals' post-onset mental health treatment is inconsistent with disabling mental health conditions.*

With respect to mental health treatment, the ALJ noted that Seals was neither psychiatrically hospitalized nor experienced episodes of decompensation, extended or otherwise, from the amended onset date through the date of decision. R. 24.  The conservative nature of Seals' mental health treatment, when sought and received, is uncontested.  But, unlike her treatment history for AIDS and hepatitis, which shows Seals regularly treated in Norfolk approximately once every six months both before and after the onset date, R. 311–64, 382–89, 406–13, 416–35, Seals' counseling and psychiatric treatment history is best described as irregular and sporadic.

After just three sessions at CPR during August and September 2013, Seals canceled her next appointment in October 2013, claiming the Norfolk office was "to[o] far to travel for now." R. 375, 379–81.  A four-month hiatus from counseling then ensued. R. 453.  Next, after returning for an emergency appointment on February 5, 2014, to discuss her spouse's "erratic behavior" and

her desire for divorce, R. 453, Seals let another four months pass before returning to CPR for counseling on June 5, 2014, R. 400. Thereafter, Seals briefly followed one of her therapist's recommendations for continued psychotherapy every two to three weeks, by attending four more treatment sessions in the summer of 2014, before abandoning treatment at CPR for the next 20 months.[24] R. 27 (noting "significant gap in treatment"), 396–99, 445. In doing so, and as noted by the ALJ, Seals also disregarded her therapist's referral for treatment with CPR's psychiatrist. R. 27, 400; *see also* R. 399, 416.

Seals next returned to treatment at CPR on April 28, 2016 when, apparently due to her lengthy absence, a "new patient" history was taken. R. 445–50. From May through June 2016, Seals received psychotherapy at CPR on three occasions, and canceled two other appointments in June and July. R. 440–44.

Soon after returning to counseling, Seals also treated with CPR's psychiatrist beginning in June 2016, over two years after her therapist's referral. R. 439. Notably, after Dr. Hyder changed Seals' mental health medications during the first appointment, the improvement noted by the ALJ soon followed. R. 27–28, 438. On July 18, 2016, Seals reported generally good toleration of her medication and improvement in anger, irritability, depression, and mood swings. R. 438. She advised that her son noticed a change for the better. *Id.* During an appointment one month later, Dr. Hyder noted continuing improvement in Seals' mood, identified as "good" and "stable," and that the medication aided in managing anxiety. R. 466.

That Seals' mental health conditions were responsive to medications is consistent with the

---

[24] As noted above, during this same period Seals regularly attended medical appointments at EVMS in Norfolk. R. 406–13, 416–31. Treatment notes from one such appointment on January 12, 2016, indicate that Seals reported seeing a therapist, at an unspecified date before the preceding six weeks, and claimed "to be doing better." R. 429. The administrative record, however, contains no other evidence of such an appointment.

ALJ's findings that, when earlier treated with Wellbutrin (and before mostly abandoning treatment in 2014), Seals' condition promptly improved. R. 27 (noting medicine working "extremely well" and that Seals was "no longer tearful"), 379–80. As further noted by the ALJ, after Seals began treatment with Dr. Hyder in June 2016, she saw "significant improvement on psychotropic medication." R. 27.

Although Seals argues that the "sample size" for this period of medication management was insufficient to support the ALJ's conclusion, Pl.'s Reply to Def.'s Mot. For Summ. J. ("Pl.'s Reply"), ECF No. 19 at 3, the Court disagrees. The record reflects that the ALJ well considered the full scope and breadth of Seals' mental health problems. The ALJ knew, for example, that Seals' mental health issues were longstanding and pre-dated the amended onset date of disability. R. 26–27 (reciting Seals' treatment at CPR in 2010). The record also reflects and the ALJ noted that, notwithstanding such issues, Seals worked both before and after (at least occasionally) the alleged, amended onset date of disability. R. 21, 253, 359, 382, 391, 406. As also recounted by the ALJ, Seals' mental health complaints coincided, in part, with the stressful tasks of caring for an ill and erratic spouse and dealing with their poor relationship and divorce in April 2015. R. 27. Because Seals claims her mental health problems became disabling on or after August 14, 2013, the ALJ rightly and carefully examined her treatment history and its efficacy, as well as Seals' apparent approach of seeking treatment on her own terms and at times best suited to her needs.

In the absence of a compelling explanation for Seals' failure to regularly pursue such treatment, particularly after her April 2015 divorce, the intermittent nature of the treatment record does not support an inference of disabling mental health limitations. *See* R. 27 (noting earlier treatment barriers as travel time and care for husband). Therapist Newsome's explanation that Seals failed to seek regular treatment due to forgetting to re-fill medications, and the disabling

effects of poor mental health, is not compelling. *See* Pl.'s Mem. 16–17; R. 365–69, 470. The ALJ properly determined that the record fails to support this claim. R. 27, 28 (noting "claimant reported a gap in treatment due to transportation issues"), 381 (noting "CPR office to[o] far to travel for now"), 369 (travel time), 380 (travel and care for husband), 453 (travel time), 416–17 (admitting failure to see therapist regularly and to schedule psychiatric appointment), 420–21 (same), 428–29 (same), 432 (same). Further, it is incongruous to contend that Seals was unable to manage her own medications, while simultaneously caring for and managing her spouse's medications and appointments. R. 23 (noting that, before divorcing, Seals "attend[ed] to her personal care tasks and care[d] for her disabled husband"), 268 (reporting "[c]are for [] husband . . . [and] mak[ing] sure his medication box is full and he gets to his doctor's visits"), 397 (noting Seals took care of "meds, meals, laundry [and] cleaning, [and] app[ointmen]ts, etc.," for spouse).

Such a claim is also at odds with the ALJ's recounting of Seals' regular attendance at appointments for AIDS and hepatitis treatment and her successful management of such conditions, by following a strict regimen of several medications. R. 23, 26–27; *see, e.g.,* R. 359 (noting "100% HAART [highly active antiretroviral therapy] compliance" with Reyataz, Norvir, and Truvada); *see also* 382–89, 406–13, 416–35.

For these reasons, the ALJ committed no error in characterizing Seals' mental health treatment record as conservative and intermittent. Further, the ALJ correctly found it significant that Seals made genuine progress in managing her mental health impairments, post-divorce, when actively participating in both psychotherapy and psychiatric medication management in the summer of 2016.[25]

---

[25] Seals also argues that she had been prescribed medications for treating mental health prior to seeing Dr. Hyder and yet still presented with disabling symptoms. Pl.'s Mem. 19. This ignores, however, the importance of treating with an appropriately-trained professional. Indeed, Alycia

### b.     *Seals' activities of daily living are inconsistent with disabling mental health conditions.*

The ALJ also attributed lesser weight to the opinions of Drs. Searfoss and Rhoad and therapist Newsome due to Seals' extensive activities of daily living. R. 28. In so doing, Seals argues that the ALJ ignored or paid insufficient attention to her testimony and treatment notes about how her impairments substantially limited such activities. Pl.'s Mem. 21–22. For the reasons reviewed above and those that follow, the record demonstrates otherwise.

The record reflects that Seals engaged in a wide range of daily activities. These included: (1) caring for her spouse (before divorce), post-stroke and post-motorcycle accident, and ensuring he took proper medications on a daily basis and attended medical appointments; (2) attending to her own serious medical conditions, by remaining medication compliant and regularly attending appointments to monitor her condition; (3) studying for and attending college-level classes in multiple semesters; (4) regularly walking and attempting to start a garden; (5) independently going out and driving to grocery stores, pharmacies, and medical appointments for herself and her spouse; (6) handling all personal care tasks and performing light housework, chores, bill-paying, and meal preparation; (7) reading, playing word games, and using social media; (8) caring for pets; and (9) engaging in relationships with others.

The ALJ not only identified these activities, but also carefully reviewed Seals' testimony and her status reports to providers and found them wanting. Specifically, the ALJ concluded that Seals' statements about her symptoms (both physical and mental) were "not entirely consistent with the medical evidence and other evidence in the record . . . ." R. 26.

---

Dickens, the nurse practitioner (and later doctor) who prescribed such medications, recognized this and referred Seals to a psychiatrist. R. 380 (wanting Seals "to see Dr. Hyder"), 423 (listing psychiatric referral for evaluation for medication); *see* R. 384 (limiting prescription to three months "until patient [sees a] Psychiatrist").

For example, the ALJ found that Seals' testimony about the side effects of her AIDS medications was not borne out by treatment records. *Compare* R. 52, 56–58 *with* R. 23 (noting "medical record does not reflect . . . diarrhea, . . . nausea, vomiting, headaches"), 26 (noting "treatment notes contain little to no mention of . . . side effects"); *see also* R. 26 (noting examination "findings [are] within normal limits" and that evidence fails to fully support "alleged loss of functioning"). Nevertheless, to account for fatigue due to Seals' physical condition, the ALJ restricted her to light work with postural and environmental limitations. R. 26.

The ALJ likewise found Seals' statements about her mental impairments not fully supported by the record. *Id.* Even before her divorce and notwithstanding her testimony to the contrary, the ALJ found that Seals exhibited only "mild restriction" in activities of daily living based upon her care for herself and her spouse, her driving and shopping, and her performance of assorted tasks about the house "without significant assistance." R. 23–25, 27. Similarly, although Seals reported avoiding human contact, isolating herself at home, and being fearful of leaving its confines, R. 47, 366, the ALJ noted she nevertheless engaged in relationships with men for extended time periods.[26] R. 23, 27–28. Rather than simply disregarding Seals' testimony and her statements to providers, however, the ALJ also found she had moderate difficulties in social functioning. R. 23.

Finally, the ALJ acknowledged that the record offered some support for Seals' assertion that poor mental health and anxiety attacks affected her ability to focus and concentrate. R. 28, 50, 58–61. But the ALJ also noted that other mental status examinations found Seals to be alert,

---

[26] The Court rejects Seals' contention this information has no bearing upon her ability to work. *See* Pl.'s Reply 2. Although perhaps of limited relevance, such information is pertinent to Seals' ability to interact with others, her ability to adapt to changes, and evaluation of her statements about the limiting effects of her psychological conditions, including her hopelessness, isolation, and ability to venture outside the home.

maintaining good eye contact, with logical thought processes, and adequate memory and concentration. R. 28. Due to the extensive nature of Seals' daily activities and the fact that medications ameliorated and stabilized her symptoms, the ALJ concluded that Seals had no more than a moderate limitation in the domain of concentration, persistence, and pace. R. 24, 28.

The foregoing establishes that the ALJ not only identified Seals' activities, but also carefully examined the record to assess what Seals was able to do, in view of her physical and mental health conditions. Accordingly, the record supports the ALJ's determination that Seals' extensive daily activities were inconsistent with a finding of disability. *See Craig*, 76 F.3d at 589 (specifying that a reviewing court is not to make credibility determinations); *Hay*, 907 F.2d at 1456 (noting the ALJ bears responsibility for "mak[ing] findings of fact and . . . resolv[ing] conflicts in the evidence").

c.      ***The decision to assign greater weight to the opinions of the state agency psychologist is supported by the record.***

The ALJ assessed the opinion evidence concerning Seals' mental RFC against the backdrop described above and looked to the extent and nature of the treatment relationships, the type of providers involved, and whether the opinions were well-supported and consistent with the record. *See* 20 C.F.R. § 404.1527(c); *see also Brown*, 873 F.3d at 256 (discussing factors to be evaluated). With respect to therapist Newsome, although as a licensed professional counselor she does not qualify as an "acceptable medical source" in assessing impairments at step two of the sequential evaluation process, 20 C.F.R. §§ 404.1502(a), 404.1527(a)(1), the ALJ recognized her as a medical source and considered her opinions about the severity of Seals' psychological impairments and her functional abilities. *See* SSR 06-03p, 2006 WL 2329939, at *2 (S.S.A.); 20 C.F.R. § 404.1527(c) (requiring ALJ to "evaluate every medical opinion" "[r]egardless of its source").

On August 23, 2016, Newsome completed a mental capacity assessment of Seals and opined she suffered from marked[27] or extreme[28] limitations in all but three of the twenty listed work-related activities and briefly listed reasons supporting her assessment. R. 469–71. The ALJ reasonably found this negative assessment of Seals' mental capacity unsupported by the record and at odds with her activities, her limited mental health treatment, and the improvement observed when Seals was treatment compliant. R. 28.

During the thirty-six month period from the amended onset date of August 2013 to August 2016, Newsome treated Seals in only seven of the months in question, and apparently last treated her in August 2014, some two years before preparing the assessment. Therefore, Newsome's statement basing her assessment partly upon "observations in sessions over several years," while true, tends to overstate the extent and recency of the treatment relationship. R. 471.

Also, as discussed above, the ALJ correctly rejected Newsome's reporting that Seals "missed or cancelled" appointments and forgot to re-fill medications and exhibited marked and extreme difficulties in understanding and remembering based upon her handling of medications. R. 469–70. These opinions were inconsistent with findings that Seals missed appointments due primarily to transportation issues, cared for both herself and her spouse (pre-divorce), regularly attended other medical appointments, was "100% HAART" compliant with her AIDS medications, and saw her condition improve when seeking treatment and taking psychological medication. R. 23–29. Finally, whereas Newsome appeared to uncritically accept Seals' statements about her

---

[27] A "marked" limitation means that one's capacity for independent and effective functioning on a sustained basis in a particular area of assessment is seriously limited. 20 C.F.R. Subpt. P, App. 1, § 12.00(F)(2)(d).

[28] An "extreme" limitation means that one is incapable of independent and effective functioning on a sustained basis in a particular area of assessment. 20 C.F.R. Subpt. P., App. 1, § 12.00(F)(2)(e).

mental health, the ALJ observed, with good reason, that her self-reporting was "not entirely consistent with" the medical and other evidence in the record.  R. 26.

Dr. Nicole Searfoss apparently worked with Newsome at CPR and signed an April 3, 2014 evaluation of Seals' mental status, apparently completed by Newsome.  R. 365–69.  The record, however, contains no evidence that Dr. Searfoss ever met with or personally treated Seals.  Thus, her evaluation appears solely predicated upon Newsome's treatment notes from three sessions in August and September 2013.  R. 369 (noting that Seals "hasn't returned [to CPR] since 9/16/2013").[29]  Therefore, the evaluation endorsed by Dr. Searfoss necessarily suffers from the same flaws in Newsome's analysis.

Newsome's observations during those three sessions did not account for Seals' extensive activities, her responsiveness to medication, and later changes in her circumstances.  For example, although relying upon Seals' reported isolation, avoidance of contact with others, and inability to leave home, R. 365–66, 369, Dr. Searfoss made no attempt to reconcile this self-report with Seals' entry into romantic relationships for several months in the same time period.  R. 27, 376, 380.  Further, in discussing Seals' difficulties in coping and attending therapy appointments, R. 366, 369, Dr. Searfoss failed to account for her role as her spouse's primary caregiver and her regular attendance at other medical appointments.  *See* R. 23 (noting ability "to attend to her personal care tasks and care for her disabled husband"); 26 (discussing March 11, 2014 treatment and reporting "100% HAART compliance").  Also, although the evaluation found Seals to be "extremely tearful throughout session," R. 367, the underlying treatment notes reflect that, after the first of the three sessions and before abandoning treatment, Seals said the "Wellbutrin was working extremely well

---

[29] Seals received treatment at CPR, on an emergency basis, on February 5, 2014.  R. 453.  Based on the language of the evaluation report, however, it appears those notes were not provided to Dr. Searfoss.

after only ten days." R. 27, 379–80 (noting Seals was "no longer tearful"). Finally, Dr. Searfoss's evaluation, coming after just three therapy appointments, came well before Seals divorced her spouse and began treating with a psychiatrist.

These later changes also impacted the ALJ's assessment of Dr. Rhoad's consultative examination. R. 28–29 (noting this June 2014 assessment occurred at a time when Seals received only intermittent mental health treatment, not involving a psychiatrist). Dr. Rhoad's assessment of Seals, like Newsome's, also apparently relied too heavily on her self-reporting. For example, although Seals told Dr. Rhoad that she "sees the counselor about once every two weeks," R. 391, in fact, during the 38-week period from September 2013 through the June 16, 2014 consultative exam date, Seals participated in psychotherapy only two times. R. 380, 400–03, 453. Thus, although Dr. Rhoad found that Seals "seemingly presented in a credible manner," R. 392, without indications of exaggeration, Seals failed to tell him that she had mostly abandoned treatment since mid-September 2013, R. 380, and had only just re-started with CPR on June 5, 2014, R. 400–03. *Cf.* R. 26 (noting breaks and gaps in treatment and that Seals' "allegations" about her mental impairments were not fully supported).

Significantly, soon after re-starting psychotherapy, Seals again showed signs of progress. For example, although tearfully telling Dr. Rhoad on June 16, 2014, that she had AIDS and "think[s] about dying all the time," R. 390, on July 22, 2014, Seals told Newsome that her "self-confidence [had] increased," that she accepted her AIDS diagnosis, that "other men now accept her [diagnosis and she] no longer feels she has to settle." R. 398; *see also* R. 396 (noting that Seals was "less tearful"). Seals also reported that she had passed her school lab and was awaiting her final grade. R. 398; *see also* R. 26 (specifying that, on a typical day, Seals spends two to four hours on school work). After this progress and as noted by the ALJ, another "significant gap in

32

treatment" followed, until Seals resumed psychotherapy and began seeing a psychiatrist in the spring and summer of 2016. R. 27, 28–29 (noting Dr. Rhoad's assessment preceded Seals' treatment with a psychiatrist).

For these reasons, sufficient grounds existed for the ALJ to assign lesser weight to Dr. Rhoad's opinions in determining Seals' RFC. *See* Pl.'s Mem. at 15–16 (arguing Dr. Rhoad's opinion was "significantly more limiting"). Moreover, rather than rejecting Dr, Rhoad's opinions entirely, the ALJ judiciously used them to define Seals' RFC and identify her non-exertional limitations. For example, like Dr. Rhoad, the ALJ recognized that Seals could only perform non-complex, simple, routine, and repetitive tasks. *Compare* R. 393 *with* R. 24. Like Dr. Rhoad, the ALJ recognized that Seals could perform only low-stress work. *Compare* R. 393–94 *with* R. 25. Like Dr. Rhoad, the ALJ recognized Seals' deficits in interacting with others, and limited her to no interaction with the public and only superficial interaction with supervisors and co-workers. *Compare* R. 393 *with* R. 25. Finally, while not fully accepting Dr. Rhoad's assessment concerning Seals' abilities to consistently perform and complete work activities, the ALJ found Seals could perform such tasks in two-hour segments, with appropriate work breaks. *Compare* R. 393–94 *with* R. 24–25; *see also* R. 28 (acknowledging that Seals' treating providers "observed an impaired attention span [and] inadequate concentration").

This leaves the opinions of the non-examining state agency psychologist, Dr. Leizer. *See* R. 110–12, 128–30. Rather than "solely" relying upon them as argued by Seals, Pl.'s Mem. 18, the ALJ only assigned "more weight" to them, while also utilizing the opinions of other providers to help establish Seals' RFC. R. 28. Because Dr. Leizer rendered his opinions in October and December 2014, after Drs. Searfoss and Rhoad, he had access to not only their opinions (and discussed Dr. Rhoad's report), but also to Seals' treatment records with CPR in the summer of

2014 showing progress in treatment.[30]  Thus, Seals' argument that Dr. Leizer "did not have access to much of the record," Pl.'s Mem. 18, ignores that Dr. Leizer's access exceeded that of Drs. Searfoss and Rhoad.  Also, as a "psychological consultant" with a Ph.D., Dr. Leizer's educational background and training exceeded that of "Ms. Newsome."  R. 28.

The Court also rejects Seals' assertion that the ALJ provided no reasons for giving added weight to Dr. Leizer's opinion.  Pl.'s Mem. 18.  Although not explicitly stated, the ALJ's decision shows that the reasons for assigning partial weight to the treating and consulting providers' opinions – the limited treatment history, the responsiveness to medications, and the extensive daily activities – likewise justified allotting greater weight to Dr. Leizer's opinions.  R. 28.  The ALJ necessarily and implicitly indicated this conclusion by discussing such matters in a single paragraph.

Further, in noting that Seals' treatment notes failed to match the marked and extreme mental limitations identified by Newsome, R. 28, the ALJ favored Dr. Leizer's views that, in various mental capacity domains, Seals was no more than moderately limited and, in some respects, not significantly limited.  R. 23–24 (finding, for example, "mild" restriction in daily activities and moderate difficulties in social functioning and concentration and persistence); *See* R. 110–11.  Also, the ALJ's repeated references to Seals' wide-ranging activities of daily living comports with Dr. Leizer's recitation of activities noted in Seals' February 13, 2014 function report.  R. 267–74.

---

[30] In any event, because the ALJ also considered Dr. Leizer's opinions in conjunction with the later acquired records showing Seals' improvement while under psychiatric care, she properly accounted for any subsequent changes in determining Seals' RFC.  *See O'Donnell v. Comm'r of Soc. Sec.*, 113 F. App'x 475, 478 (3d Cir. 2004) (holding that the ALJ could rely upon the opinions of state agency physicians who did not have access to a report if the ALJ considered the report, along with the other evidence of record, in assessing the RFC).

Although Seals argues that Dr. Leizer's opinion is an outlier and characterizes him as the "odd man out," Pl.'s Reply 4–5, substantial evidence supports the ALJ's conclusion that this is not the case. While SSA's regulations indicate that greater weight typically will be given to the opinion of a treating source, rather than a non-treating source, 20 C.F.R. § 404.1527(c)(1), they also direct that an ALJ must consider the opinions of such experts in disability evaluation, 20 C.F.R. § 404.1513a(b)(1), and weigh them based upon the support provided and their evaluation of the evidence of record, 20 C.F.R. § 404.1527(c)(3). Based upon the ALJ's review of the entire record and for the reasons discussed above, the Court finds no error in the ALJ's treatment of the opinion evidence.[31] *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (stating that an ALJ may rely upon a non-examining physician's opinion to the extent it is consistent with the record).

## VI. RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 16) be **DENIED** and the Commissioner's motion for summary judgment (ECF No. 17) be **GRANTED**.

## VII. REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of

---

[31] For the reasons stated in this report, the Court also rejects Seals' argument that the ALJ's hypothetical questions to the VE failed to account for all of her limitations. Pl.'s Mem. 23.

the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits

an extra three (3) days, if service occurs by mail.  A party may respond to any other party's

objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P.

72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

      2.      A district judge shall make a *de novo* determination of those portions of this report

or specified findings or recommendations to which objection is made.

      The parties are further notified that failure to file timely objections to the findings and

recommendations set forth above will result in a waiver of appeal from a judgment of this Court

based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*,

737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

 

                                 /s/

                           Robert J. Krask
                           United States Magistrate Judge

                              Robert J. Krask
                    UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 19, 2018